UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILMINGTON TRUST COMPANY, et al., | CASE NO. C20-0402-RSM-MAT |
| Plaintiffs, | |
| v. | REPORT AND RECOMMENDATION |
| THE BOEING COMPANY, et al., | |
| Defendants. | |

<u>INTRODUCTION</u>

This matter comes before the Court on a Motion to Dismiss filed by defendant The Boeing Company ("Boeing"). (Dkt. 41.) Boeing seeks dismissal of all non-contractual claims filed by plaintiffs Wilmington Trust Company ("WTC"), as Owner Trustee, and F & L Aviation IV, LLC (F&L), as Beneficial Owner of aircraft bearing manufacturer's serial number 61329, and Brilliant Aviation Limited ("Brilliant"), owner and operator of aircraft bearing manufacturer's serial number 62743. Plaintiffs oppose the motion to dismiss (Dkt. 49-1) and the parties request oral argument. The Court, having considered the briefing, does not find oral argument necessary and recommends the motion to dismiss be GRANTED in part and DENIED in part as discussed below.

REPORT AND RECOMMENDATION
PAGE - 1

BACKGROUND

This matter concerns alleged defects in Boeing Business Jet (BBJ) MAX aircraft purchased by plaintiffs. The BBJ MAX is a variant of the 737 MAX, the most recent generation of the Boeing 737, and is sold through the BBJ division for private use. (Dkt. 1-2, ¶¶22-26.) On July 26, 2017, plaintiffs WTC/F&L (through their predecessor in interest) acquired by assignment the right to purchase Aircraft 61329 under a purchase agreement dated March 20, 2014. (*Id*., ¶15.) Boeing consented to the assignment and WTC/F&L took delivery of the aircraft on November 29, 2018. (*Id*.) Plaintiff Brilliant agreed to purchase Aircraft 62473 under a purchase agreement dated December 23, 2015 and took delivery of the aircraft on January 11, 2019. (*Id*.)[1]

After two well-known crashes and the resulting grounding of MAX aircraft, plaintiffs brought this suit raising claims for breach of contract, fraud, material misrepresentation of fact, and violations of the Washington Consumer Protection Act (WCPA) and Washington Product Liability Act (WPLA). As reflected in the summary of their allegations below, plaintiffs contend they purchased BBJ MAX aircraft based on Boeing's representations as to its safety and reliability, that Boeing fast-tracked the MAX without regard to safety standards, and that Boeing misrepresented and withheld material facts regarding defects in the aircraft.[2]

A.    Origins of the MAX

In August 2011, Boeing announced its plan to update its 737NG with the 737 MAX. (*Id*., ¶30.) This announcement followed an earlier plan to replace the 737NG with an entirely new

---

[1] Boeing indicates the Amended and Restated Bill of Sale reflects delivery of Brilliant's BBJ MAX on August 13, 2018, but accepts the alleged delivery date for purposes of the motion to dismiss.

[2] As discussed below, the Court concludes it may consider documents and media reports cited in the complaint. *See infra* n.3. Where necessary or helpful for a full understanding of plaintiffs' claims, the Court includes dates of events described within the cited materials and, in the discussion, citations to some of those materials.

REPORT AND RECOMMENDATION
PAGE - 2

aircraft to compete with the Airbus A320neo, a new aircraft from Boeing's competitor offering fuel-saving engines with a "fly-by-wire" or computer-controlled system. (*Id.*, ¶¶27-28.) Boeing altered its plan shortly after American Airlines revealed a large purchase of Airbus aircraft. (*Id.*, ¶30.) The upgrade to the MAX would take less time than creating an entirely new aircraft, but would include new, more fuel-efficient engines and a fly-by-wire system in place of manual and conventional flight controls. (*Id.*, ¶¶28, 30.) Boeing also sought to certify the MAX under the Amended Type Certificate originally granted to the 737 by the Federal Aviation Administration (FAA) in December 1967. (*Id.*, ¶¶22, 30.)

B.    MAX Design and Defects

        In designing the MAX, Boeing sought to create something similar to the 737NG to allow for quick certification, minimize pilot training, cut costs for airlines, and compete with the A320neo. (*Id.*, ¶31.) It imposed an internal directive to avoid any requirement for 737NG-trained pilots to obtain MAX training in a flight simulator, resulting in training that could be completed on a computer or tablet in less than an hour. (*Id.*, ¶¶32, 84.) "'The company was trying to avoid costs and trying to contain the level of change. They wanted the minimum change to simplify the training differences, minimum change to reduce costs, and to get it done quickly.'" (*Id.*, ¶42.) Boeing also directed few if any changes be made to the cockpit display. (*Id.*) The focus on reduced training was reflected in the original MAX brochure and an offer to Southwest Airlines of a $1-million-per-plane rebate if pilot training was required. (*Id.*, ¶33.) Boeing employees described the pace of work in creating the MAX as "frenetic", on an "'extremely compressed'" timeline, with "sloppy blueprints" rushed to assembly technicians. (*Id.*, ¶31.)

        Plaintiffs aver, on information and belief, that competitive pressures and the marketing-driven directive to minimize training led Boeing to hide significant issues with the MAX and to

REPORT AND RECOMMENDATION
PAGE - 3

take shortcuts to quickly bring it to market. (*Id.*, ¶35.) Boeing moved the new, more fuel-efficient, but larger and heavier engines "up and forward", which allowed for compliance with regulatory requirements without making extensive design changes to the aircraft. (*Id.*, ¶36.) This new location resulted in a propensity for the aircraft's nose to abnormally "pitch up" under certain unusual flight conditions, which could cause a dangerous aerodynamic "stall." (*Id.*, ¶¶37-38.) Boeing engineers predicted this tendency in 2012, "early in the design process," particularly in a high-speed test maneuver in which the aircraft experiences significant G-forces. (*Id.*, ¶37.) Rather than making an aerodynamic change, Boeing developed a software fix – the MCAS (Maneuvering Characteristics Augmentation System) – to automatically activate a downward stabilizer when it sensed the aircraft was near a stall and experiencing high G-forces. (*Id.*, ¶39.)

"About a third of the way through flight testing in 2016", after discovering the same pitch up problem with certain low-speed, low-G maneuvers, Boeing expanded the MCAS fix. (*Id.*, ¶40.) In an effort to eliminate the pitch up tendency at low speeds, Boeing made "critical and dangerous changes to MCAS." (*Id.*) Boeing made the anti-stall system four times more powerful, so that it pushed the nose down more aggressively than originally designed, and eliminated dependence on both an Angle of Attack (AOA) vane and a G-Force meter to sense an impending stall, leaving MCAS to rely on only one of two AOA vanes on the aircraft. (*Id.*, ¶¶40-41.) It did not include self-diagnostic software in MCAS to detect and deactivate an obviously malfunctioning AOA vane, and programmed MCAS to reset itself five seconds after every application of pitch-down stabilizer trim, never stopping so long as it believed the aircraft was close to stalling. (*Id.*) Plaintiffs allege Boeing made these changes despite evidence of risks. For example, in 2015, an employee raised concerns MCAS was vulnerable to malfunctioning if a single sensor failed and, in November 2016, a test pilot described the system as "running rampant" and the plane as

"trimming itself like cra[z]y" in a flight simulator.  (*Id*., ¶¶44-45.)

Plaintiffs allege Boeing withheld material information from plaintiffs, other purchasers, pilots, and regulators.  For instance, Boeing considered but decided against including a cockpit alert that would tell pilots when MCAS engaged.  (*Id*.)  It initially included but later removed information about MCAS in drafts of materials supplied to purchasers and pilots, including flight crew operating manuals.  (*Id*., ¶¶57-59 (noting one exception in mechanic maintenance manuals).)  In June 2017, a Lion Air representative who informed Boeing of the intent to conduct simulator training for transition to the MAX was told there was "'absolutely no reason'" for that requirement: "'Once the engines are started, there is only one difference between NG and MAX procedurally, and that is that there is no OFF position of the gear handle. Boeing does not understand what is to be gained by a three-hour simulator session, when the procedures are essentially the same.'"  (*Id*., ¶82.)  Boeing employees expressed concern a decision by Lion Air to require more training would influence other MAX operators.  (*Id*.)

Plaintiffs aver Boeing provided incomplete or inaccurate information about MCAS to the FAA.  In as early as 2013, Boeing employees recognized that treating MCAS as a new function would result in "'a greater certification and training impact'" and that it should instead be treated as an "'addition to speed trim.'"  (*Id*., ¶85.)  Boeing informed the FAA a malfunction in MCAS would mimic a "trim runaway" error on which 737 pilots were already trained.  (*Id*., ¶52.)  However, runaway trim involves continuous motion and can be stopped by hitting a switch, while MCAS commanded "10 second bursts of trim followed by five second pauses[]" and restarted after a pilot released a trim switch.  (*Id*., ¶53.)  Boeing also appears to have either falsely told or led the FAA to believe MCAS obtained data from more than one sensor and would rarely, if ever, activate.  (*Id*., ¶52.)

REPORT AND RECOMMENDATION
PAGE - 5

In 2016, a Boeing official described performing a "jedi mind trick" to get approval by regulators, and stated he "basically lied to the regulators (unknowingly)[.]" (*Id.*, ¶54.) In 2017, the same individual stated "[d]elete MCAS", in seeking approval to remove it from the manual. (*Id.*, ¶58.) In March of that year, a Boeing official stated: "I want to stress the importance of holding firm that there will not be any type of simulator training required to transition from NG to MAX. Boeing will not allow that to happen. We'll go face to face with any regulator who tries to make that a requirement.'" (*Id.*, ¶84.) In a 2018 message apparently referring to interactions with the FAA, a Boeing employee stated: "I still haven't been forgiven by God for the covering up I did last year[.]" (*Id.*, ¶83.)

Boeing reported a potential MCAS failure should be ranked as "major" (causes "physical distress to occupants of aircraft"), rather than hazardous (likely to result in "serious or fatal injury to small number" of occupants) or catastrophic (likely to result in "multiple fatalities and/or loss of" aircraft). (*Id.*, ¶¶46-49.) However, the safety analysis originally submitted in support of certification did not include the changes to MCAS's increased power, resetting function, and reliance on a single sensor. (*Id.*) In depicting MCAS as benign, unlikely to activate, and similar to an already known error, Boeing succeeded in avoiding a training requirement and removing it from the manual. (*Id.*, ¶¶51-54.) The FAA also agreed to waive requirements for cockpit alerts after Boeing argued their addition would be "'impractical" and cost too much. (*Id.*, ¶50.)

C.    Marketing of the MAX

Plaintiffs allege that, in marketing to purchasers, Boeing claimed the MAX would offer similar benefits to the A320neo, while ensuring 737NG-trained pilots would need little or no additional training, and that the MAX would maintain or exceed the 737NG's reputation for safety and reliability. (*Id.*, ¶¶55, 87.) For example, in 2014, Boeing's publication *Aero* touted the MAX

as offering "'improved fuel efficiency and reduced noise while extending the 737's reputation for reliability and retaining commonalities with the current 737 fleet.'" (*Id.*, ¶88.) At the 2017 Paris Air Show, the Boeing MAX Chief Pilot asserted the MAX "'is configured to be very common with the NG . . . so a pilot can walk into [the cockpit] and will find everything he can just like he can in the NG'"; that the MAX was FAA-approved for two-and-a-half hours of computer-based training; and that "'[t]he only minor difference'" from the NG was in the display, "to move some of the center console items here on the forward console.'" (*Id.*, ¶56.) He did not disclose the existence of MCAS. Nor did Boeing mention MCAS in either the flight crew operating manuals or the Detail Specifications provided to plaintiffs. (*Id.*, ¶¶57-59.) It also failed to disclose the inadvertent deactivation in most MAX aircraft of an "AOA disagree" warning light, despite discovering that defect during software development in 2017. (*Id.*, ¶¶60, 65.) Plaintiffs allege Boeing oversold the benefits of the MAX, while underplaying, denying, or failing to disclose material dangers, consistent with a "self-described practice of having its sales force 'lie [to purchasers] about how awesome our airplanes are.'" (*Id.*, ¶62.)

D.    Crashes and Grounding

On October 28, 2018, Lion Air Flight 610 crashed some eleven minutes after takeoff, killing all 189 passengers and crew on board. (*Id.*, ¶63.) The single AOA sensor incorrectly "'told'" MCAS the aircraft was stalled and MCAS pushed the aircraft's nose down twenty-six times, eventually overcoming the pilots' efforts to avoid the crash. (*Id.*)

A Flight Crew Operations Manual Bulletin issued by Boeing on November 6, 2018 did not mention MCAS. (*Id.*, ¶¶65-66.) Boeing also issued public statements suggesting pilot error caused the crash. (*Id.*) An Emergency Airworthiness Directive issued by the FAA on the following day advised of the "unsafe condition" posed by "an erroneously high single AOA sensor input" that

could lead to difficulty controlling the airplane and possible impact with terrain, and ordered Boeing to modify its MAX manual to include specific warnings and instructions on procedures to respond to an erroneously triggered MCAS.  (*Id.*, ¶¶67-68 & n.54.)  Two days later, Boeing disclosed the existence of MCAS in an email to purchasers, pilots, and others, and advised pilots "'can' use electric trim switches on the control column prior to hitting cutout switches to disable the MCAS program."  (*Id.*, ¶69.)  Boeing also publicly claimed the "MAX is as safe as any airplane that has ever flown the skies."  (*Id.*, ¶90.)  Boeing delivered BBJ MAX aircraft to WTC/F&L on November 28, 2018 and to Brilliant on January 11, 2019.  (*Id.*, ¶70.)

On March 10, 2019, Ethiopian Air Flight 302 crashed some six minutes after takeoff, killing all 157 passengers and crew on board.  (*Id.*, ¶71.)  The crash followed the persistent engagement of MCAS due to the failure of the single AOA sensor relied upon and forced the aircraft into an unrecoverable dive.  (*Id.*, ¶72.)  It occurred despite the pilots' success in hitting cutout switches described in Boeing's emergency directive.  (*Id.*)

Within three days of the crash, aviation regulators worldwide grounded all MAX aircraft. (*Id.*, ¶73.)  On April 24, 2019, Boeing admitted MCAS activated in response to erroneous AOA information in both the Lion Air and Ethiopian Air crashes and that it was Boeing's responsibility to eliminate that risk.  (*Id.*, ¶74.)  To date, the MAX remains grounded and investigations and other lawsuits are ongoing.  (*Id.*, ¶¶74-85.)  Plaintiffs each revoked acceptance of their aircraft by written notice on January 29, 2020, but have been unable to return the aircraft because of the continued grounding.  (*Id.*, ¶96.)

## DISCUSSION

Boeing now moves to dismiss all of plaintiffs' non-contractual claims.  Specifically, Boeing seeks dismissal under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) of claims

for fraud, material misrepresentation of fact, and violations of the WCPA and WPLA.

To state a claim for relief under Rule 8(a)(2), a pleading must provide a "short and plain statement" of the claim showing the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the court construes the complaint in the light most favorable to the nonmoving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). The court is not, however, required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

To satisfy Rule 8(a) and survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). While detailed factual allegations are not necessary, a complaint must offer "more than labels and conclusions" and contain more than a "formulaic recitation of the elements of a cause of action[.]" *Twombly*, 550 U.S. at 555.[3]

---

[3] As a general matter, the Court may not consider material beyond the complaint in ruling on a Rule 12(b)(6) motion. *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). Exceptions to this rule include material properly submitted as a part of the complaint and documents not physically attached to the pleading if the contents are alleged in the complaint and no party questions the authenticity. *Id. See also United States v. Ritchie*, 342 F.3d 903, 907-09 (9th Cir. 2003) (a document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."), and *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018)

REPORT AND RECOMMENDATION
PAGE - 9

Claims sounding in fraud or mistake are subject to a heightened pleading standard under Rule 9(b).  *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228 (9th Cir. 2019).  Under Rule 9(b), a plaintiff "must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *Id.*  However, the complaint must include an account of the time, place and specific content of false representations and the identities of the parties to the misrepresentations.  *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019).  A plaintiff must, in other words, allege "the who, what, when, where, and how" of the alleged fraud.  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).  The allegations "'must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'"  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).

In some circumstances, the Rule 9(b) standard may be relaxed where information is within a defendant's control and a plaintiff "can not be expected to have personal knowledge of the relevant facts."  *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).  *Accord Diaz v. Green Tree Servicing, LLC*, C15-0359-RSL, 2015 WL 3451278 at *7 (W.D. Wash. 2015).  "However, this exception does not nullify Rule 9(b); a plaintiff who makes allegations on information and belief must state the factual basis for the belief."  *Neubronner*, 6 F.3d at 672 (allegation of "no

(incorporation-by-reference doctrine "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims.")  A court may also take judicial notice of "'matters of public record[,]'"  *Lee*, 250 F.3d at 688-89 (quoted source omitted), meaning a fact "not subject to reasonable dispute" because the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  The parties in this case appear to agree the Court may consider all of the materials cited in the complaint and the Court likewise finds that consideration appropriate.

REPORT AND RECOMMENDATION
PAGE - 10

more than 'suspicious circumstances'", in that case that "Milken was an investment banker for Gibralter and that Gibralter eventually sank into financial trouble", did not "constitute a sufficient factual basis for allegations of insider trading.") (citations omitted).  This exception allows for relaxing Rule 9(b) "to permit discovery in a limited class of corporate fraud cases where the evidence of fraud is within a defendant's exclusive possession."  *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001).

The Rule 9(b) standard is also relaxed in cases of fraudulent omission.  *Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122, 1132 (W.D. Wash. 2010) (citing *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098-99 (N.D. Cal. 2007)).  *Accord Zwicker v. Gen. Motors Corp.*, C07-0291-JCC, 2007 WL 5309204 at *4 (W.D. Wash. July 26, 2007).  A plaintiff alleging fraudulent omission or concealment of material information "'will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim.'" *Carideo*, 706 F. Supp. 2d at 1132 (quoting *Falk*, 496 F. Supp. 2d at 1098-99).  The plaintiff must still plead a claim of fraudulent omission or concealment with particularity. *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1325 (C.D. Cal. 2013).  *See also Waldrup v. Countrywide Financial Corp.*, C13-8833, 2014 WL 3715131 *5 (C.D. Cal. July 23, 2014) (where fraudulent omission is at issue, the requirements of Rule 9(b) are relaxed, but not eliminated).  Specifically, the plaintiff must plead "sufficient circumstances underlying the fraudulent practice such that [d]efendants have 'notice of the particular misconduct . . . so that they can defend against the charge[s].'"  *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 935 (N.D. Cal. 2013) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

A.      Fraud and Negligent Misrepresentation

The parties generally agree the fraud and misrepresentation claims are subject to Rule

9(b)'s heightened pleading standard[4] and that their similarity allow for addressing them together.

Under Washington law, the elements of fraud (intentional misrepresentation) include:

> (1) representation of an existing fact; (2) materiality of the representation; (3) falsity of the representation; (4) the speaker's knowledge of the falsity; (5) the speaker's intent that the information be acted upon by the plaintiff; (6) plaintiff's ignorance of the falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) resulting damages.

*BP West Coast Products LLC v. SKR Inc.*, 989 F. Supp. 2d 1109, 1119-20 (W.D. Wash. 2013)

(citing *Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996)).  The elements of negligent

misrepresentation include:

> (1) supply of false information for guidance of others in their business transactions; (2) defendant knew or should have known the representations were false; (3) defendant was negligent in obtaining or communicating the false information; (4) plaintiff relied on the false information; (5) reliance was justified; and (6) reliance was the proximate cause of damages.

*Id.* at 1120 (citing *Lawyers Title Ins. Corp. v. Soon J. Baik*, 147 Wn.2d 536, 545, 55 P.3d 619

(2002)).  Either claim can be based on omission of material facts where there is a duty to disclose.

*See Zwicker*, 2007 WL 5309204 at *2, 4.

      Boeing argues plaintiffs fail to state a particularized, plausible claim for fraudulent

inducement and that a fraud by omission claim lacks particularity, plausibility, and is contrary to

---

[4] Plaintiffs describe the question of whether a claim for negligent misrepresentation must satisfy the heightened pleading standard as unsettled. *Whitsitt v. Allen & Associates, LLC*, C13-1133-JCC, 2013 WL 12071675 at *3 n.1 (W.D. Wash. Oct. 4, 2013) (citing *Anschutz Corp. v. Merrill Lynch & Co.*, 785 F. Supp. 2d 799. 823 (N.D. Cal. 2011) (the Ninth Circuit "has not decided" whether Rule 9(b)'s heightened pleading standard applies to negligent misrepresentation claims), and other conflicting district court decisions).  As in other cases decided in this district, the Court applies the heightened pleading standard to the claim of negligent misrepresentation.  *See, e.g., Velicer v. Falconhead Capital, LLC*, C19-1505-JLR, 2020 WL 1182962 at *7 (W.D. Wash. Mar. 11, 2020).

REPORT AND RECOMMENDATION
PAGE - 12

settled law.  Plaintiffs assert the sufficiency of their pleading in relation to both misrepresentation and omission of existing facts.

1.   Misrepresentation of existing facts:

Plaintiffs allege they relied on Boeing's claims about the characteristics, reliability, and safety of the MAX in deciding to purchase BBJ MAX aircraft.  (Dkt. 1-2, ¶86.)  They allege they made the decision to purchase a MAX, rather than an A320neo or another aircraft, based on Boeing's representations it was an improvement to the 737NG, would operate like the NG and require little or no training, and would maintain or exceed the NG's reputation for safety and reliability.  (*Id.*, ¶87.)  They point to the 2014 *Aero* article touting the MAX as offering "'improved fuel efficiency and reduced noise while extending the 737's reputation for reliability and retaining commonalities with the current 737 fleet,'" and Boeing's claim, after the Lion Air crash, that the "MAX is as safe as any airplane that has ever flown the skies."  (*Id.*, ¶¶88, 90).  The complaint also cites the 2017 Paris Air Show statements as to the MAX's commonality with the NG, allowing a pilot to walk in and find everything the same except for a minor difference in the console display, and the FAA approval for two-and-a-half hours of computer-based training.  (*Id.*, ¶56.)

Boeing contends the allegations of inducement insufficiently rely on the *Aero* article and Paris Air Show.  Plaintiffs, in response, identify the following as additional evidence of an overall strategy to conceal defects and induce plaintiffs and others to purchase a MAX without discovering those defects:  (1) false statements to the FAA and customers that an MCAS malfunction could be addressed as runaway trim (*id.*, ¶¶52-53, 66); (2) detail specifications provided to plaintiffs that do not reference MCAS (*id.*, ¶59); (3) a practice of having Boeing's sales force "lie [to purchasers] about how awesome our airplanes are" (*id.*, ¶62); (4) the November 2018 email stating pilots "'can' use electric trim switches" to disable MCAS (*id.*, ¶69); (5) the June 2017 statements to and about

1    Lion Air discouraging pilot simulator training and identifying the absence of an off position of the

2    gear handle as the single difference with the NG (*id*., ¶82); (6) the 2018 statement by a Boeing

3    employee: "I still haven't been forgiven by God for the covering up I did last year" (*id*., ¶83); and

4    (7) the strategy, in as early as 2013, to refer to MCAS only as an "'addition to speed trim.'" (*id*.,

5    ¶85).   The Court, for the reasons set forth below, agrees with Boeing that plaintiffs fail to

6    sufficiently plead claims based on inducement.

7            Many of the alleged misrepresentations were made to others, such as the FAA and Lion

8    Air, not to plaintiffs.  Rule 9(b) requires "an account of the 'time, place, and specific content of

9    the false representations as well as the identities of the parties to the misrepresentations.'"  *Swartz*,

10   476 F.3d at 764 (citation omitted).  Plaintiffs do not plead any facts supporting a contention they

11   were aware of and relied on statements made to the FAA or others in deciding to purchase MAX

12   aircraft, such as the identities of individuals who heard or became aware of the statements and

13   when, where, and how that occurred.  *See, e.g.*, *Great Pac. Sec. v. Barclays Capital, Inc.*, 743 F.

14   App'x 780, 782-83 (9th Cir. 2018) (complaint failed to plead reliance with particularity where

15   there was no indication plaintiff was aware of alleged false representations or received various

16   materials, and, for the one item received, did not indicate whether a specific individual at the

17   corporation read it or how they relied on it) (citations omitted); *Schaaf v. Highfield*, 127 Wn. 2d

18   17, 30, 896 P.2d 665 (1995) (no reliance where plaintiff did not see report until after purchase).[5]

19           The alleged misrepresentations also include statements made well after the December 2015

20   and July 2017 purchase agreements.   Fraudulent misrepresentations "must predate" the act

---

[5] Plaintiffs cite to the First Circuit decision in *Learjet Corp. v. Spenlinhauer*, 901 F.2d 198, 200
(1st Cir. 1990), to support a contention that false statements to the FAA satisfy the reliance element because
their purchase agreements expressly required FAA airworthiness certificates.  However, plaintiffs do not
identify any consistent Ninth Circuit or Washington case law or address any pertinent cases subsequent to
the First Circuit decision (*see* Dkt. 52 at 3, n.1).

REPORT AND RECOMMENDATION
PAGE - 14

1  induced.  *Oregon Mut. Ins. Co. v. Barton*, 109 Wash. App. 405, 409, 36 P.3d 1065 (2001).

2  Plaintiffs could not have been aware of and therefore could not have relied on any statements made

3  after they decided to purchase a MAX.  *See, e.g.*, *Deschaine v. IndyMac Mortg. Servs.*, 617 F.

4  App'x 690, 692 (9th Cir. 2015) (where the "alleged misrepresentations were made *after*" plaintiff

5  defaulted and received loan modifications, plaintiff "failed to demonstrate that he continued

6  seeking a loan modification because of the alleged misrepresentations.") (emphasis in original).

7  For example, alleged misrepresentations to "customers" and "purchasers" refer to, respectively,

8  Boeing's public announcement after the 2018 Lion Air crash and internal Boeing employee

9  communications revealed during investigations subsequent to both crashes.  (Dkt. 1-2, ¶¶62, 66.)[6]

10         Although the facts are within their possession, plaintiffs do not provide any facts associated

11  with the detail specifications for their MAX aircraft.  In particular, they do not indicate when they

12  received those documents and, as such, whether they could have been induced to purchase MAX

13  aircraft based on their content.  Nor could plaintiffs allege they were privy to and relied on the

14  early internal Boeing strategy of referring to MCAS as an addition to speed trim.  Plaintiffs

15  maintain they were unaware of MCAS until after the 2018 Lion Air crash.

16         Plaintiffs further fail to sufficiently plead claims of inducement with consideration of the

17  *Aero* article and air show comments.  For instance, if plaintiffs relied on the 2014 *Aero* article in

18  later deciding to purchase a MAX, they are in possession of and must plead facts supporting the

19  element of reliance, including who read and relied on the information in the article, when that

---

[6] Clarification is also warranted in relation to the pleading of an alleged Boeing sales force practice. The document cited in support of that allegation provides the following context:  "Forkner joked about what would happen if they no longer worked together and said, if Gustavsson left Boeing, 'I'd ask for a job in sales where I can just get paid to drink with customers and lie about how awesome our airplanes are.'" https://www.washingtonpost.com/local/trafficandcommuting/text-messages-show-boeing-employees-knew-in-2016-of-problems-that-turned-deadly-on-the-737-max/2019/10/18/8578c990-f1ca-11e9-89eb-ec56cd414732 _story.html.

REPORT AND RECOMMENDATION
PAGE - 15

occurred, and how the information contained within impacted their decisions. Because Brilliant

entered into its purchase agreement in December 2015, more than a year-and-a-half prior to the air

show, it cannot be said to have relied upon statements made at that event. F&L/Wilmington,

through their predecessor in interest, acquired by assignment the right to purchase a MAX aircraft

in July 2017, a month after the air show. Yet, plaintiffs do not set forth facts in support of a

contention someone, at some point and location, heard and somehow relied on misrepresentations

at the air show event.

The complaint, in sum, does not plead with particularity or identify misrepresentations on

which plaintiffs could be said to have relied in deciding to purchase MAX aircraft. To the extent

based on inducement, the fraud and misrepresentation claims do not withstand scrutiny. The Court

therefore proceeds to consideration of alleged fraudulent omissions.

2.    Omission of existing facts:

Plaintiffs allege Boeing failed to disclose MCAS, the different flight characteristics of the

MAX that resulted in the addition of that software, and associated risks prior to their purchases,

that this information was uniquely within Boeing's knowledge and control, and that they only

learned the truth following the March 2019 Ethiopian Air crash. Plaintiffs identify omitted

information as including how the addition and placement of larger engines on the MAX altered its

aerodynamics; the use of MCAS in lieu of making aerodynamic changes; the impact of MCAS,

such as how it could cause the MAX to enter into a dive with a fault or malfunction in one of the

aircraft's two AOA sensors; and the absence of any education or training on MCAS or emergency

procedures for its malfunction. (*See id.*, ¶¶133-35, 152-55.) They contend these omissions allow

for an inference of deception, further evidenced by the "'jedi mind trick'" used to secure FAA

approval and the removal of references to MCAS from manuals and detail specifications. (*Id.*,

¶¶54, 57-59.) Plaintiffs maintain the decision to withhold this material information resulted in two fatal crashes and that those crashes and their damages could have been prevented with disclosure and training. (*Id.*, ¶¶42, 80, 116.)

Boeing points to the timing of the facts relied upon by plaintiffs as refuting fraud by omission. Specifically, Boeing made the alleged "critical and dangerous changes to MCAS" in 2016, a year after Brilliant entered into its purchase agreement (*id.*, ¶¶15, 40), and did not discover the inadvertent deactivation of the AOA disagree warning light in most MAX aircraft until August 2017, after both purchase agreements (*id.*, ¶¶60, 65). Boeing also points to missing information within plaintiff's control, including when the purchase agreement for Aircraft 61329 was assigned to F&L and then WTC (as opposed to their predecessor in interest), or descriptions of meetings with Boeing at which information was not disclosed.

Boeing denies any facts plausibly suggesting it had "actual, subjective knowledge" of a defect, *Sloan v. Thompson*, 128 Wn. App. 776, 787, 115 P.3d 1009 (2005), or, as a corporation, "consensus" about undisclosed facts, *Pope v. Univ. of Wash.*, 121 Wn.2d 479, 493, 852 P.2d 1055 (1993). Plaintiffs do not, for example, allege facts suggesting Boeing's senior executives were aware of statements made by an engineer, test pilot, or other employee during the MAX's design, development, and certification process. Boeing denies any known or existing defects triggering a duty to disclose because they are within the seller's "knowledge at the time of sale." *Norris v. Church & Co., Inc.*, 115 Wn. App. 511, 514, 63 P.3d 153 (2002). *See, e.g.*, *Atherton Condo. Apartment–Owners Ass'n Bd. of Dir. v. Blume Dev. Co.*, 115 Wn.2d 506, 524-25, 799 P.2d 250 (1990) (describing defects such as a termite condition, failing drainage system, or seeping septic system).

A claim of fraudulent omission satisfies Rule 9(b) where a plaintiff pleads "sufficient facts

which, if taken as true, suggest" a defendant had a duty to disclose information about "defects at the point at which they had knowledge of them." *Short v. Hyundai Motor Company*, 444 F. Supp. 3d 1267, 1280 (W.D. Wash. 2020). In Washington, "when a 'manufacturer has superior information regarding defects that are not readily ascertainable to customers, it has a duty to disclose that information.'" *Id.* (quoting *Carideo*, 706 F. Supp. 2d at 1133 (quoting *Zwicker*, 2007 WL 5309204 at \*4), and citing *Testo v. Russ Dunmire Oldsmobile, Inc.*, 16 Wn. App. 39, 554 P.2d 349, 358 (1976)). *See also Griffith v. Centex Real Estate Corp.*, 93 Wn. App. 202, 214-15, 969 P.2d 486 (1998) ("Our cases establish a general duty on the part of a seller to disclose facts material to a transaction when the facts are known to the seller but not easily discoverable by the buyer."), *as amended on denial of reconsideration* (Dec. 14, 1998). However, the duty to disclose depends on a defendant's knowledge of the alleged defects at the time of purchase. *Short*, 444 F. Supp. 3d at 1280-81.

This Court has found an allegation that manufacturers implemented a "fix" to a vehicle prior to purchase allowed for the plausible inference the manufacturer was "aware of the problem that needed fixing[,]" and that allegations of earlier consumer complaints to a government agency and vehicle recalls buttressed that inference. *Id.* at 1273, 1281-82 ("Plaintiffs allege that Defendants 'definitely knew' about the defects . . . by mid-2016 at the latest, because [they] introduced programming that presumably remedied the problem[.]") On the other hand, where a plaintiff purchased or leased a vehicle prior to implementation of the fix and recalls, customer complaints did not alone create a plausible inference of knowledge. *Id.* at 1282-83.

More recently, the Court clarified that the allegation of a "mid-2016 fix" was "sufficient to allege knowledge of the defect as of 2016." *Short v. Hyundai Motor Co.*, No. C19-0318-JLR, 2020 WL 6132214 at \*6 (W.D. Wash. Oct. 19, 2020). In other words, it was reasonable to infer

the manufacturer was aware of the defect before it was able to fix it.  *Id.* (citing *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014) (finding it reasonable to infer a manufacturer that issued service bulletins and updates in 2012 "should have known of" the alleged defects "by around 2011, i.e., before it could recommend what repairs or updates needed to be done."))  However, the monitoring of customer complaints or known rigorous testing of vehicles were allegations "too general" to demonstrate knowledge of defects.  *Id*. at *7.

In this case, plaintiffs identify facts which, if taken as true, suggest Boeing had a duty to disclose information about defects not readily ascertainable to its customers and about which Boeing had knowledge at the time of plaintiffs' purchases.  Those facts include Boeing's discovery, in 2012, that the new engine placement in the MAX resulted in a pitch up tendency that could cause a dangerous stall and the implementation of a software fix through MCAS; the decision, in as early as 2013, to treat MCAS as an addition to speed trim in order to avoid the more difficult certification process and training that would have been required if it had been treated as a new function; the resulting absence of any education or training on MCAS or emergency procedures in the event of malfunction; and concerns raised in 2015 of MCAS's vulnerability to malfunctioning if a single sensor failed.  (Dkt. 1-2, ¶¶36-39, 42, 85.)[7]

Additional facts alleged, but dated after one or both purchase agreements, may be considered as providing for an inference of knowledge at an earlier point in time.  For instance, a 2016 description of the "jedi mind trick" performed to secure regulatory approval reflects actions taken prior to the use of that phrase.  (*Id.*, ¶¶54, 58, 84.)[8]  Other details, such as when Boeing

---

[7] *See, e.g.,* 14 C.F.R. § 25.230(a) (stating in FAA Airworthiness standards for transport category airplanes:  "No abnormal nose-up pitching may occur. . . . In addition, it must be possible to promptly prevent stalling and to recover from a stall by normal use of the controls.")

[8] *See* https://www.seattletimes.com/business/boeing-aerospace/explosive-text-messages-reveal-

REPORT AND RECOMMENDATION
PAGE - 19

1    considered but decided against including a cockpit alert that would tell pilots when MCAS engaged

2    and when it initially included and later removed MCAS from manuals and detail specifications are

3    reasonably construed as information within Boeing's exclusive control, not accessible to plaintiffs.

4    (*Id.*, ¶¶45, 57-59.)[9]   The pleading also generally provides sufficient detail of circumstances

5    underlying the alleged fraud and misrepresentation such that defendants cannot be said to be

6    without notice and unable to defend against the misconduct charged.

7         Plaintiffs allege other facts falling after Brilliant's December 2015 purchase agreement,

8    but prior to the purchase of F&L/WTC.   In particular, plaintiffs allege Boeing made critical and

9    dangerous changes to MCAS in 2016, which is necessarily prior to the time at which F&L/WTC,

10   through their predecessor in interest, acquired by assignment the right to purchase a MAX aircraft

11   in July 2017.   Those changes, along with other facts alleged, provide additional support for a

12

---

13   boeing-knew-of-mcas-aggression-in-2016-and-misled-faa/("In the Nov. 15, 2016, message exchange,

14   Forkner tells Gustavsson that MCAS is now active down to Mach 0.2 – meaning at low speed, not just in
     the high-speed maneuver for which it was originally designed. He adds that it will now be necessary to
15   update the description of the system, presumably referring to material Boeing provides the FAA. 'So I
     basically lied to the regulators (unknowingly)'"); https://www.washingtonpost. com/local/ trafficand
16   commuting/faas-lax-oversight-played-part-in-boeing-737-max-crashes-but-agency-is-pushing-to-become-
     more-industry-friendly/2019/10/27/bc0bf184-f4e1-11e9-ad8b-85e2aa00b5ce_ story.html ("In a 2016
17   email, Forkner told an FAA official he was 'doing a bunch of travelling though the next few months' and
     . . . would be - 'jedi-mind tricking regulators into accepting the training that I got accepted by FAA etc.'";
18   "Delete MCAS," Mark Forkner, then Boeing's chief 737 technical pilot, wrote to an FAA official in 2017
     as the plane's five-year certification was nearing the finish line."); https://www. reuters.com/article/us-
19   boeing-737max-factbox/factbox-in-boeing-internal-messages-employees-distrust-the-737-max-and-mock-
     regulators-idUSKBN1Z90NP (March 2017: "I want to stress the importance of holding firm that there
20   will not be any type of simulator training required to transition from NG to MAX.  Boeing will not allow
     that to happen.  We'll go face to face with any regular who tries to make that a requirement.'")

21         [9] *See* https://www.nytimes.com/2019/10/30/business/boeing-muilenburg-testimony-congress.
     html; https://www.washingtonpost.com/local/trafficandcommuting/faas-lax-oversight-played-part-in-
22   boeing-737-max-crashes-but-agency-is-pushing-to-become-more-industry-friendly/2019/10/27/
     bc0bf184-f4e1-11e9-ad8b-85e2aa00b5ce_story.html ("Boeing was so hungry to create an aircraft that
23   wouldn't require current 737 pilots to go through expensive retraining that it ran an active company effort
     to remove information about the MCAS from the Flight Crew Operating Manual, according to
     congressional officials and copies of Boeing emails.")

REPORT AND RECOMMENDATION
PAGE - 20

fraudulent omission claim by F&L/WTC.  (*See*, *e.g.*, *id.*, ¶¶40-41 (anti-stall system made four times more powerful, limited reliance to one sensor, programmed to repeatedly reset itself, and no self-diagnostic software included to detect and deactivate an obviously malfunctioning AOA vane); ¶44 (test pilot's November 2016 description of the system as "running rampant" and the plane as "trimming itself like cra[z]y"); and ¶¶82, 84 (early 2017 communications to FAA reflecting ongoing effort to avoid simulator training for pilots).)

As Boeing observes, it remains unclear whether various statements of its employees are properly construed as reflecting knowledge on the part of the corporation itself.  However, the claims include knowledge as an essential element, *see BP West Coast Products LLC*, 989 F. Supp. 2d at 1119-20, not the "corporate consensus" required in a claim of intentional withholding or nonpayment of wages, *Pope*, 121 Wn.2d at 491, 493.[10]  As stated in one Washington case: "Because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization else it could always limit its liability."  *J.M.S. Farms, Inc. v. Dep't of Wildlife*, 68 Wn. App. 150, 157-58, 842 P.2d 489 (1992) (citations omitted).  Plaintiffs' claims do not, in any event, depend on any of the various statements of Boeing employees described in the complaint.  The Court finds the

---

[10] The decision in *Pope*, 121 Wn.2d at 491, addressed claims raised on summary judgment, not at the pleading stage, in finding no evidence in the record to support a finding of corporate consensus.  Other cases relied upon by Boeing are also distinguishable.  *See, e.g.*, *Gomez v. Bank of Am., N.A.*, 642 F. App'x. 670, 676 (9th Cir. Mar. 2, 2016) (to satisfy Rule 9(b), plaintiff's RICO claim must contain "adequate factual allegations to plausibly infer that the Bank Defendants, not just Vahedi [who operated a ponzi scheme], specifically intended to defraud them."); *Beaty v. Ford Motor Co.*, C17-5201-RBL, 2020 WL 639408 at *3 (W.D. Wash. Feb. 11, 2020) (plaintiff failed to meet summary judgment burden of providing evidence from which a reasonable trier of fact could find defendant knew about alleged sunroof defect at the time of purchase given that plaintiff relied only on evidence of "similar" defects in other models and vehicles, not in the vehicle she purchased); *Austin v. Ettl*, 171 Wn. App. 82, 87-89, 286 P.3d 85 (2012) (observing absence of a duty to disclose "not-yet-extant" defects and finding no legal merit to a claim where real property seller did disclose encumbrances and plaintiff alleged only a failure to disclose "*potential* cost of *proposed* encumbrances") (emphasis in original).

REPORT AND RECOMMENDATION
PAGE - 21

statements properly considered as merely buttressing the inference of Boeing's knowledge. *See Short*, 444 F. Supp. 3d at 1282.

Nor does Boeing otherwise show plaintiffs' failure to sufficiently plead, with particularity and plausibility, the remaining elements of their claims. The omitted information – including, ultimately, the risk that MCAS could cause a deadly airplane crash – is self-evidently material. *See id.* ("The specific defect alleged – that a vehicle may malfunction and catch on fire – is more than plausibly material.") (citing *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1173 (C.D. Cal. 2010) (a "fundamental" safety consideration is material to consumers)). The omission of that material information satisfies the element of falsity given the duty to disclose those facts. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018) ("Even if a statement is not false, it may be misleading if it omits material information."); *Zwicker*, 2007 WL 5309204 at *2 ("A negligent omission satisfies the [element of falsity], provided that a party has a duty to disclose the information."). Plaintiffs also allege facts in support of the contention Boeing knew or should have known they had a duty to disclose and intended that plaintiffs act upon omitted information, including efforts to classify MCAS in a way to prevent its disclosure, more difficult certification, or the need for training, and plaintiffs' ignorance of material facts as a result. (Dkt. 1-2, ¶¶84-85, 93.)

In regard to the elements associated with reliance, plaintiffs allege they would not have purchased MAX aircraft had they been aware of undisclosed defects and justification for the reliance because the MAX is an extremely complex product and only Boeing was in a position to know its systems and performance. (*Id.*, ¶¶97, 142, 145, 161, 164.) While plaintiffs did not identify any specific meetings at which information was not disclosed, the complexity of the product, Boeing's position as an aircraft manufacturer, and the numerous facts alleged regarding

the design, development, and FAA certification process provide the necessary particularity and plausibility for the pleading of reliance. *See, e.g., S.L. Anderson & Sons, Inc. v. PACCAR, Inc.*, C18-0742-JCC, 2018 WL 5921096 at *19-20 (W.D. Wash. Nov. 13, 2018) ("A plaintiff may establish actual reliance by proving 'that, had the omitted information been disclosed, one would have been aware of it and behaved differently.' Reliance can be presumed when the omission is material, as when a reasonable consumer 'would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'") (quoting *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015)); *Carideo*, 706 F. Supp. 2d at 1133 (plaintiffs sufficiently plead "the what (concealment of three specific defects . . .)," "the why (to induce customers to purchase the computers at the price sold . . . )", and how defendant "should have conveyed to them the existence of the alleged defects: in any manner prior to the sale or at the time a customer reported a problem."); *Sloan v. GM, LLC*, 287 F. Supp. 3d 840, 875-78 (N.D. Cal. 2018) (plaintiffs alleging material safety defect in vehicles would likely meet the Rule 9(b) burden "so long as they provide plausible allegations, . . . that they would have received the information in some way had Defendant exercised reasonable care.") (citation omitted).[11]  Plaintiffs, finally, plead the element of damages caused by their reliance, including substantial payments for unsafe aircraft that remain grounded and inoperable. (Dkt. 1-2, ¶¶97-99.)

Boeing also asserts, but fails to support its request for dismissal based on "overarching"

---

[11] In a case preceding *Sloan* and involving false advertising, a district court found a pleading would satisfy Rule 9(b) if it described the content of the fraudulent omission and where the omitted information should or could have been revealed, and provided representative samples of advertisements or representations relied on and omitting the information. *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009). In *Sloan* and other cases involving material safety defects, courts found the identification of such advertisements or representations not necessary, and the proper focus to be "what channels of information customers depend upon and whether the defendant could have taken action to disseminate information through those channels[.]" *Sloan*, 287 F. Supp. 3d at 875-78.

REPORT AND RECOMMENDATION
PAGE - 23

1  flaws in the pleading, such as the failure to outline allegations and facts specific to the two separate

2  plaintiffs and contracts, or to account for the multiple transfers and assignments of the purchase

3  agreement for Aircraft 61329.  While relevant to claims of inducement, *see, e.g.*, *Bisson v. Bank*

4  *of America, N.A.*, 919 F. Supp. 2d 1130, 1137 (W.D. Wash. 2013) ("Plaintiffs must, at a minimum,

5  match allegedly fraudulent statements to particular Plaintiffs and explain how each Plaintiff relied

6  on that statement and suffered damages."), and *Heian v. Fischer*, 189 Wn. 59, 61-63, 63 P.2d 518

7  (1937) ("The law is that an action for damages for fraud can only be brought by the one to whom

8  the fraudulent representations were made."), these arguments do not undermine the sufficiency of

9  the claims of fraudulent omission.  As explained above, plaintiffs allege facts that, if taken as true,

10  suggest Boeing had a duty to disclose information about defects not ascertainable by plaintiffs and

11  about which Boeing had knowledge at the time Brilliant and F&L/WTC purchased MAX aircraft.

12  *Short*, 444 F. Supp. at 1280.  Nor is it necessary, given the sufficiency of the allegations, to address

13  the parties' various contract-related arguments.  (*See* Dkt. 49-1 at 15-17 & Dkt. 52 at 4-5, 10.)

14       Plaintiffs, in sum, allege circumstances of alleged fraudulent omissions sufficient to put

15  Boeing on "notice of the particular misconduct . . . so that they can defend against the charge[s]."

16  *Vess*, 317 F.3d at 1106 (internal citations omitted).  Taking all factual allegations in the complaint

17  as true and drawing all reasonable inferences in their favor, plaintiffs plausibly allege claims of

18  fraud and negligent misrepresentation sufficient to withstand the motion to dismiss.

19  B.  <u>Washington Consumer Protection Act</u>

20       The WCPA serves to "protect the public" from "fraudulent acts or practices."  RCW §

21  19.86.920.  To sustain a claim under the WCPA, a plaintiff must plead and ultimately prove five

22  elements: (1) defendant engaged in an unfair or deceptive act or practice, (2) the act occurred in

23  trade or commerce, (3) the act affects the public interest, (4) plaintiff suffered injury to its business

1  or property, and (5) the injury was causally related to the act. *Trujillo v. NW Trustee Servs., Inc.*,

2  183 Wn.2d 820, 834-35, 355 P.3d 1100 (2015); *Hangman Ridge Training Stables, Inc. v. Safeco*

3  *Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

4       Boeing argues the WCPA claim should be dismissed under Rule 9(b) and due to plaintiffs'

5  inability to satisfy the "public interest" element. The Court, for the reasons set forth below, finds

6  the latter contention to warrant dismissal of this claim.

7       To meet the WCPA's "unfair or deceptive act or practice" element, a plaintiff "need not

8  show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to

9  deceive a substantial portion of the public." *Hangman Ridge Training Stables, Inc.*, 105 Wn.2d at

10  785 (emphasis in original; citations omitted). For a private plaintiff to meet the "public interest"

11  element, it must show "not only that a defendant's practices affect the private plaintiff but that they

12  also have the potential to affect the public interest." *Indoor Billboard/Wash., Inc. v. Integra*

13  *Telecom of Wash., Inc.*, 162 Wn.2d 59, 74, 170 P.3d 10 (2007) (citations omitted). As further

14  explained in *Behnke v. Ahrens*, 172 Wn. App. 281, 294 P.3d 729 (2012):

15       In applying the requirement that the allegedly deceptive act has the
16       capacity to deceive "a substantial portion of the public," the concern
        of Washington courts has been to rule out those deceptive acts and
17       practices that are unique to the relationship between plaintiff and
        defendant. The definition of "unfair" and "deceptive" must be
18       objective to prevent every consumer complaint from becoming a
        triable violation of the act. Thus, our Supreme Court has said that
19       actionable deception exists where there is a practice likely to
        mislead a "reasonable" or "ordinary" consumer.

20       As for determining whether the complained of conduct affects the
        public interest, this element also is factual in nature. Where the
21       transaction was essentially a private dispute rather than essentially a
        consumer transaction, it may be more difficult to show that the
22       public has an interest in the subject matter. Ordinarily, a breach of
        a private contract affecting no one but the parties to the contract is
23       not an act or practice affecting the public interest. . . . It is the
        likelihood that additional plaintiffs have been or will be injured in

REPORT AND RECOMMENDATION
PAGE - 25

1          exactly the same fashion that changes a factual pattern from a private
2          dispute to one that affects the public interest.

3    *Id*. at 292-93 (all internal and other citations omitted).

4          The WCPA is a broad-ranging statute, but is "not intended to cover every conceivable

5    business transaction; there are business relationships which by their nature are exempted from

6    qualification for [WCPA] liability."  *Glob. Cure Med. LLC v. Alfa Pharma LLC*, No. C19-588-

7    MJP, 2020 WL 6075920 at *11 (W.D. Wash. Oct. 15, 2020).  Here, as in other cases recently

8    decided in this Court, the circumstances fall outside the WCPA and within those proscribed in

9    *Behnke*.  That is, "[w]hile the controversy at the heart of this litigation ultimately affected a

10   significant portion of the public" – with two MAX 8 crashes resulting in the loss of hundreds of

11   lives and affecting countless others – "that is not the focus of the inquiry into which the [WCPA]

12   requires."  *Ride the Ducks Seattle LLC v. Ride the Ducks Int'l LLC*, C19-1408-MJP, 2020 WL

13   5291928 at *5 (W.D. Wash. Sep. 3, 2020) (discussing impact of victims of a traffic accident and

14   their family and friends).  The WCPA "is aimed at curtailing unfair and/or deceptive practices

15   which are likely, through unchecked repetition, to have a recurring negative effect on 'a substantial

16   portion of the public *engaged in the same or similar transactions*."  *Id*.  (emphasis added).

17         This case involves an underlying contractual dispute between private purchasers of

18   executive jets and a division of Boeing which appears to deliver, on average, some nine or ten such

19   jets per year.  *See* https://boeing.mediaroom.com/2018-10-15-Boeing-Business-Jets-Delivers-

20   First-BBJ-MAX-Airplane ("Since its launch in 1996, [BBJ] has delivered 234 jets on 260

21   orders.").  Because "a private contract between parties in a highly specialized industry does not

22   involve practices which are 'likely to mislead a 'reasonable' or 'ordinary' consumer[,]'" this case

23   does not present "a consumer transaction in which the public has an interest intended to fall under

WCPA protection." *Ride the Ducks Seattle LLC*, 2020 WL 5291928 at \*5. *Accord Glob. Cure Med. LLC*, 2020 WL 6075920 at \*11 (similarly finding that, while the controversy at the heart of litigation "ultimately could affect some portion of the public[,]" the transactions at issue – involving two participants in the pharmaceutical grey market – did not entail facts showing the private contracts between parties in a highly specialized industry involve practices likely to mislead a reasonable or ordinary consumer) (citing *Behnke*, 172 Wn. App. at 192-93).

It is also true that, as reflected above, the public interest element is "factual in nature." *Behnke*, 172 Wn. App. at 192-93 (citation omitted). This does not alter the Court's conclusion. In assessing whether a private dispute has a public interest impact, courts may consider the following: "(1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?" *Hangman Ridge Training Stables, Inc.*, 105 Wn.2d at 790-91. None of these factors are dispositive and they need not all be present. *Id.* (*See also* Dkt. 41 at 19, n.11 (explaining that Washington courts continue to apply this test following passage of a statute generally defining public interest for purposes of private WCPA claims).)

While Boeing committed the alleged deceptive acts and practices in the course of its business, the Court finds an absence of facts supporting any of the remaining public interest impact inquiries. Neither plaintiffs' allegations, nor the documents incorporated by reference in the complaint are reasonably construed as supporting a contention Boeing advertises BBJ jets to the general public. (Dkt. 1-2, ¶¶25-26.)[12] Plaintiffs concede "there are no allegations that Boeing

---

[12] *See* https://boeing.mediaroom.com/2018-10-15-Boeing-Business-Jets-Delivers-First-BBJ-MAX-Airplane ("'We are excited to begin delivering a longer-range and more capable version of the world's most popular business jetliner,' said Greg Laxton, head of [BBJ]. 'There has been great market

1    explicitly and personally solicited Plaintiffs to purchase their individual MAX aircraft." (Dkt. 49-

2    1 at 21.)   An assertion of unequal bargaining power is undermined by the fact plaintiffs are

3    companies in a position to purchase executive jets and allege they could have chosen to purchase

4    an A320neo or another aircraft. (Dkt. 1-2, ¶87.) Considering these factors and the circumstances

5    at issue in this case, the Court finds a failure to state a claim under the WCPA.

6    C.    Washington Product Liability Act

7        The WPLA provides a cause of action for harm caused by products that are not designed,

8    constructed, or labeled in a reasonably safe manner. RCW § 7.72.030.   A plaintiff may bring a

9    product liability claim under the WPLA against the manufacturer for harm caused by a product.

10   RCW § 7.72.010(4). "Harm" for purposes of the statute "does not include direct or consequential

11   economic loss." RCW § 7.72.010(6).   "The WPLA explicitly confines recovery to physical harm

12   suffered by persons and property and leaves purely economic loss to [contract law]."  *Hofstee v.*

13   *Dow*, 109 Wn. App. 537, 543, 36 P.3d 1073 (2001) (citing RCW § 7.72.010(6); *Touchet Valley*

14   *Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 351, 831 P.2d 724

15   (1992)). *See also Wash. Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 857-60, 774 P.2d

16   1199 (1989).  Washington courts refer to this as the WPLA's "economic loss" exclusion.  *Touchet*

17   *Valley Grain Growers, Inc.*, 119 Wn.2d at 351.[13]

18       Defendants move to dismiss plaintiffs' WPLA claim under the economic loss exclusion.

19   Plaintiffs allege Boeing is liable under the WPLA because the defects in the MAX are sudden and

20

21   interest and anticipation for the BBJ MAX and our valued customers will soon be able to see the new
     standard in business travel.'  Customers from around the world have placed orders for 20 BBJ MAX
22   airplanes. Most recently, Seacons Trading Ltd announced in July it is purchasing a BBJ MAX 7 at the 2018
     Farnborough International Airshow. . . [BBJ] offers a portfolio of ultra-large-cabin, long-range airplanes
     that are perfectly suited for business and private, charter, corporate and head-of-state operations.")

23       [13] The WPLA does not preempt plaintiffs' claims sounding in fraud or a claim under the WCPA.
     *Hoefs v. Sig Sauer Inc*., C20-05173-RBL, 2020 WL 3488155 at *2 (W.D. Wash. June 26, 2020).

REPORT AND RECOMMENDATION
PAGE - 28

dangerous conditions that have created sudden and calamitous events, and that the safety and insurance interests of tort law are applicable to their claims.  (Dkt. 1-2, ¶198.)

"Washington courts employ a 'risk of harm analysis' to determine whether a harm constitutes pure economic loss or instead 'something more' that sounds in tort and is thus remedial under the WPLA."  *Moodie v. Remington Arms Co., LLC*, C13-0172-JCC, 2013 WL 12191352 at *6 (W.D. Wash. Aug. 2, 2013) (citing *Graybar Elec. Co.,* 112 Wn.2d at 865-66, and *Staton Hills Winery Co., Ltd. v. Collons*, 96 Wn. App. 590, 595, 980 P.2d 784 (1999) (manufacturer of "unsafe product that creates an unreasonable risk of harm to persons or property" can be held liable under WPLA)).  Under that analysis, "'the fact that a hazardous product defect has injured only the product itself, and not persons or other property, is properly regarded as a pure fortuity' and does not preclude recovery under the WPLA; 'the same remedy is made available for this sort of injury as would be available if the product defect had injured something or someone else.'"  *Id.* (quoting *Graybar Elec. Co.*, 112 Wn.2d at 865-66).

Two tests are utilized in the risk of harm analysis: (1) the "sudden and dangerous" test; and (2) the "evaluative approach."  *Touchet Valley Grain Growers, Inc.*, 119 Wn.2d at 351-52.  The first test looks to the manner of a product's failure; if the failure "is the result of a sudden and dangerous event, it is remediable under [the WPLA]."  *Id.* at 351.  The second test "proceeds on the theory that a product user should not have to suffer a calamitous event before earning his remedy."  *Id.* 351, 353 (citing *Graybar Elec. Co.*, 112 Wn.2d at 866-67).  Under this evaluative approach, the court considers  (1) the "nature of the defect," and whether it "is such that the plaintiff has been exposed through a hazardous product, to an unreasonable risk of harm to his person or his property," (2) whether the "type of risk" is that underlying the "safety-insurance concerns of tort law[,]" and (3) whether the "manner in which injury arose" was "tortious," as opposed to

REPORT AND RECOMMENDATION
PAGE - 29

"through some disappointment of [the plaintiff's] expectations under the contract." *Id.* at 353-54.

Boeing asserts an exception to the economic-loss exclusion applies only if the potential harmful event manifests *in the plaintiff's own product.* *See Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 396, 241 P.3d 1256 (2010) ("When a product defect results in *injury* only to the product *itself*, [as opposed to injury or damage to other property], the risk of harm must be carefully analyzed. The WPLA tort duties are implicated if a hazardous product exposes a person or property to an unreasonable risk of harm such that the safety interests of the WPLA are implicated.") (emphasis added); *Touchet Valley Grain Growers, Inc.*, 119 Wn.2d at 351 (describing the sudden and dangerous test as "distinguishing economic loss from other damages principally according to the *manner* in which the product failure *has occurred.*") (emphasis added). Boeing contends that, because plaintiffs' aircraft have not suffered MCAS malfunction or another event involving physical damage, there is no basis for applying the risk of harm analysis in the first instance. *See Hofstee*, 109 Wash. App. at 544-46 (stating in a case involving a "brucellosis reactor" cow: "[T]he cow here did not actually have brucellosis and therefore was never unreasonably dangerous.") Boeing adds that, even if applied, there was no sudden and highly dangerous event or "real, nonspeculative" danger of physical injury because the aircraft were never flown after delivery. *Touchet Valley Grain Growers, Inc.*, 119 Wn.2d at 338-39, 353-54 (finding sudden collapse of grain storage building, causing moisture and pests to destroy grain, constituted a sudden and dangerous event: "the risk of structural collapse posed a real, nonspeculative danger of physical injury to any persons walking in or about the flathouse building. It is simply fortuitous that no persons were present when the [structure] fell to the ground.") Boeing also contends that allowing plaintiffs' claim would undermine the text and stated purpose of the WPLA, which does not permit recovery for economic loss and serves to protect against "'substantially increasing

product liability insurance costs and unwarranted exposure to product liability litigation.'" *Brewer v. Fibreboard Corp.*, 127 Wn.2d 512, 521, 901 P.2d 297 (1995) (quoting preamble to RCW chap. 7.72).

To the extent Boeing generally challenges the viability of the risk of harm analysis, this contention does not support dismissal. Both this Court and Washington courts recognize exceptions to the WPLA's economic loss exclusion. Nor is it clear plaintiffs could only state a WPLA claim if they had experienced MCAS-related malfunction while flying their MAX aircraft. Under the risk of harm analysis, "the fact that a hazardous product defect has injured only the product itself, and not persons or other property, is properly regarded as a 'pure fortuity[]'" and the same remedy is thus "made available for this sort of injury as would be available if the product defect had injured something or someone else." *Graybar Elec. Co.*, 112 Wn.2d at 865-66 (citations omitted). This Court has, for example, found exceptions to the economic-loss exclusion in instances where a gun defect and a speedometer failure could have, but did not cause damage to property or injury or death to others. *Moodie*, 2013 WL 12191352 at *7; *Zwicker*, 2007 WL 5309204 at *2-3. Boeing distinguishes such cases as involving plaintiffs who experienced the product defects at issue, albeit without suffering the harm risked by those defects. However, Boeing does not appear to dispute the allegation that the aircraft at issue in this case suffer the same alleged defects contained in the MAX aircraft that crashed.

Boeing's arguments also appear to rest entirely on the sudden and dangerous test. It does not address the evaluative approach, which "proceeds on the theory that a product user should not have to suffer a calamitous event before earning his remedy in tort." *Touchet Valley Grain Growers, Inc.*, 119 Wn.2d at 351. Plaintiffs allege the BBJ MAX aircraft were not reasonably safe as designed, include defects that could cause the aircraft to enter into an unrecoverable dive

REPORT AND RECOMMENDATION
PAGE - 31

and crash, and that Boeing failed to inform them of the defects and the dangers posed. The allegations set forth defects posing an unreasonable risk of harm to persons, property, and the products themselves, implicating the safety-insurance policies of tort law, and extending beyond products contracted for that simply did not work as planned. Considered as such, the Court concludes plaintiffs state a WPLA claim sufficient to withstand the motion to dismiss. *See, e.g.*, *Moodie*, 2013 WL 12191352 at *7 (denying motion to dismiss because the alleged defect – the risk a rifle would fire without a trigger pull and damage property or injure or kill people – exposed owners to an unreasonable risk of harm and was "precisely the type of safety risk" underlying the safety-insurance concerns of tort law; nor was the case merely about a product that failed to perform as expected under a contract (i.e., a failure to fire when the trigger was pulled), it concerned a hazard "'peripheral to the product's function'—that the rifle will spontaneously fire without a trigger pull."); *Zwicker*, 2007 WL 5309204 at *2-3 (denying motion to dismiss negligent misrepresentation claim under economic loss exclusion where alleged defect – failure of a speedometer – was clearly a sudden and dangerous event in risking collision of motorists, the nature of the defect implicated the safety insurance policies of tort law "'much more'" than the expectation-bargain protection policies of contract law, a failing speedometer presented significant risks to persons, and it could be said to be a mere fortuity a known plaintiff was not injured). *Cf. Hofstee*, 109 Wn. App. at 544-46 (finding no exception under the evaluative approach because the failure to test cows prior to delivery "was more in the nature of a breach of warranty than a delivery of a hazardous product[,]" the risk a cow "would turn out to be a 'brucellosis reactor' was somewhat significant" but "clearly foreseeable by parties that bargained at arm's length[,]" and the defect was not a sudden or dangerous event because brucellosis testing is required under the law, the threat of exposure is "recognized and accounted for in any sale of dairy cattle within the

state[,]" and the cow "did not actually have brucellosis").

## CONCLUSION

The Court, in sum, recommends Boeing's Motion to Dismiss (Dkt. 41) be GRANTED in part and DENIED in part. Boeing fails to demonstrate its entitlement to dismissal of either the WPLA claim or the fraud and misrepresentation claims under a theory of omission of material facts. However, because the Court finds a failure to state a claim for relief under the WCPA, that claim should be DISMISSED.

## OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **November 20, 2020**.

DATED this 4th day of November, 2020.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 33