1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10

11

12

| WILMINGTON TRUST COMPANY, et al., | CASE NO. C20-402 RSM-MAT |
|---|---|
| Plaintiffs, | |
| v. | ORDER ON OBJECTIONS TO REPORT AND RECOMMENDATION |
| THE BOEING COMPANY, et al., | |
| Defendants. | |

13

## I.      INTRODUCTION

14

15

16

17

18

19

20

21

This matter is before the Court for consideration of the Report and Recommendation (R&R) of United States Magistrate Judge Mary Alice Theiler recommending that the Court grant in part and deny in part The Boeing Company's (Boeing or Defendant) partial motion to dismiss Plaintiffs'[1] claims.  Dkt. #57.  Plaintiffs bought, and accepted delivery of, variants of the Boeing 737 MAX aircraft from Boeing.  After the second of two highly publicized Boeing 737 MAX crashes and the subsequent grounding of all Boeing 737 MAX aircraft, Plaintiffs revoked acceptance of their aircraft and filed this action, bringing claims for breach of contract, fraud, material representation, and violations of the Washington Consumer Protection Act (WCPA) and

22

23

24

---

[1] Plaintiffs are the Wilmington Trust Company (WTC), as Owner Trustee, and F & L Aviation IV, LLC (F&L), as Beneficial Owner of aircraft bearing manufacturer's serial number 61329, and Brilliant Aviation Limited (Brilliant), owner and operator of aircraft bearing manufacturer's serial number 62743.

ORDER – 1

the Washington Product Liability Act (WPLA). Dkt. #1-2. Boeing sought dismissal of Plaintiffs'

non-contract claims. Dkt. #41. After consideration, Judge Theiler recommended that the Court

dismiss Plaintiffs' WCPA claim, but otherwise permit Plaintiff's non-contract claims—for fraud,

material misrepresentation, and violation of the WPLA—to proceed with Plaintiff's contractual

claims. Dkt. #57 at 33. Both Plaintiffs and Defendant raise objections to Judge Theiler's R&R.

Dkts. ##59–60. Having reviewed the objections, and responses thereto, the Court adopts the

R&R in part, as detailed below.

## II.     BACKGROUND[2]

### A.     Origins of the MAX

In August 2011, Boeing announced its plan to update its 737NG [aircraft to] the 737 MAX. ([Dkt. #1-2], ¶30.) This announcement followed an earlier plan to replace the 737NG with an entirely new aircraft to compete with the Airbus A320neo, a new aircraft from Boeing's competitor offering fuel-saving engines with a "fly-by-wire" or computer-controlled system. (*Id*., ¶¶27-28.) Boeing altered its plan shortly after American Airlines revealed a large purchase of Airbus aircraft. (*Id*., ¶30.) The upgrade to the MAX would take less time than creating an entirely new aircraft, but would include new, more fuel-efficient engines [while retaining][3] manual and conventional flight controls. (*Id*., ¶¶28, 30.) Boeing also sought to certify the MAX under the Amended Type Certificate originally granted to the 737 by the Federal Aviation Administration (FAA) in December 1967. (*Id*., ¶¶22, 30.)

### B.     MAX Design and Defects

In designing the MAX, Boeing sought to create something similar to the 737NG to allow for quick certification, minimize pilot training, cut costs for airlines, and compete with the A320neo. (*Id*., ¶31.) It imposed an internal directive to avoid any requirement for 737NG-trained pilots to obtain MAX training in a

---

[2] The Court adopts the factual background as set out in the R&R, making only minor alterations, as noted.

[3] The parties agree that this alteration is necessary to reflect the factual record. The R&R indicates that the upgrade "would include new, more fuel-efficient engines <u>and a fly-by-wire system in place of</u> manual and conventional flight controls." Dkt. #57 at 3 (emphasis added). Plaintiffs object that their complaint specifically alleged that "the 737 MAX retained previous 737's manual conventional system for the primary flight controls and did not incorporate a fly-by-wire system." Dkt. #59 at 2 (citing Dkt. #1-2 at ¶¶ 28, 30). Defendants agree. Dkt. #64 at 3.

ORDER – 2

flight simulator, resulting in training that could be completed on a computer or tablet in less than an hour. (*Id.*, ¶¶32, 84.) "'The company was trying to avoid costs and trying to contain the level of change. They wanted the minimum change to simplify the training differences, minimum change to reduce costs, and to get it done quickly.'" (*Id.*, ¶42.) Boeing also directed few if any changes be made to the cockpit display. (*Id.*) The focus on reduced training was reflected in the original MAX brochure and an offer to Southwest Airlines of a $1-million-per-plane rebate if pilot training was required. (*Id.*, ¶33.) Boeing employees described the pace of work in creating the MAX as "frenetic", on an "'extremely compressed'" timeline, with "sloppy blueprints" rushed to assembly technicians. (*Id.*, ¶31.)

Plaintiffs aver, on information and belief, that competitive pressures and the marketing-driven directive to minimize training led Boeing to hide significant issues with the MAX and to take shortcuts to quickly bring it to market. (*Id.*, ¶35.) Boeing moved the new, more fuel-efficient, but larger and heavier engines "up and forward", which allowed for compliance with regulatory requirements without making extensive design changes to the aircraft. (*Id.*, ¶36.) This new location resulted in a propensity for the aircraft's nose to abnormally "pitch up" under certain unusual flight conditions, which could cause a dangerous aerodynamic "stall." (*Id.*, ¶¶37-38.) Boeing engineers predicted this tendency in 2012, "early in the design process," particularly in a high-speed test maneuver in which the aircraft experiences significant G-forces. (*Id.*, ¶37.) Rather than making an aerodynamic change, Boeing developed a software fix – the MCAS (Maneuvering Characteristics Augmentation System) – to automatically activate a downward stabilizer when it sensed the aircraft was near a stall and experiencing high G-forces. (*Id.*, ¶39.)

"About a third of the way through flight testing in 2016", after discovering the same pitch up problem with certain low-speed, low-G maneuvers, Boeing expanded the MCAS fix. (*Id.*, ¶40.) In an effort to eliminate the pitch up tendency at low speeds, Boeing made "critical and dangerous changes to MCAS." (*Id.*) Boeing made the anti-stall system four times more powerful, so that it pushed the nose down more aggressively than originally designed, and eliminated dependence on both an Angle of Attack (AOA) vane and a G-Force meter to sense an impending stall, leaving MCAS to rely on only one of two AOA vanes on the aircraft. (*Id.*, ¶¶40-41.) It did not include self-diagnostic software in MCAS to detect and deactivate an obviously malfunctioning AOA vane, and programmed MCAS to reset itself five seconds after every application of pitch-down stabilizer trim, never stopping so long as it believed the aircraft was close to stalling. (*Id.*) Plaintiffs allege Boeing made these changes despite evidence of risks. For example, in 2015, an employee raised concerns MCAS was vulnerable to malfunctioning if a single sensor failed and, in November 2016, a test pilot described the system as "running rampant" and the plane as "trimming itself like cra[z]y"[4] in a flight simulator. (*Id.*, ¶¶44-45.)

---

[4] Alteration in original.

ORDER – 3

Plaintiffs allege Boeing withheld material information from plaintiffs, other purchasers, pilots, and regulators. For instance, Boeing considered but decided against including a cockpit alert that would tell pilots when MCAS engaged. (*Id.*) It initially included but later removed information about MCAS in drafts of materials supplied to purchasers and pilots, including flight crew operating manuals. (*Id.*, ¶¶57-59 (noting one exception in mechanic maintenance manuals).) In June 2017, a Lion Air representative who informed Boeing of the intent to conduct simulator training for transition to the MAX was told there was "'absolutely no reason'" for that requirement: "'Once the engines are started, there is only one difference between NG and MAX procedurally, and that is that there is no OFF position of the gear handle. Boeing does not understand what is to be gained by a three-hour simulator session, when the procedures are essentially the same.'" (*Id.*, ¶82.) Boeing employees expressed concern a decision by Lion Air to require more training would influence other MAX operators. (*Id.*)

Plaintiffs aver Boeing provided incomplete or inaccurate information about MCAS to the FAA. In as early as 2013, Boeing employees recognized that treating MCAS as a new function would result in "'a greater certification and training impact'" and that it should instead be treated as an "'addition to speed trim.'" (*Id.*, ¶85.) Boeing informed the FAA a malfunction in MCAS would mimic a "trim runaway" error on which 737 pilots were already trained. (*Id.*, ¶52.) However, runaway trim involves continuous motion and can be stopped by hitting a switch, while MCAS commanded "10 second bursts of trim followed by five second pauses[]"[5] and restarted after a pilot released a trim switch. (*Id.*, ¶53.) Boeing also appears to have either falsely told or led the FAA to believe MCAS obtained data from more than one sensor and would rarely, if ever, activate. (*Id.*, ¶52.)

In 2016, a Boeing official described performing a "jedi mind trick" to get approval by regulators, and stated he "basically lied to the regulators (unknowingly)[.]"[6] (*Id.*, ¶54.) In 2017, the same individual stated "[d]elete MCAS",[7] in seeking approval to remove it from the manual. (*Id.*, ¶58.) In March of that year, a Boeing official stated: "I want to stress the importance of holding firm that there will not be any type of simulator training required to transition from NG to MAX. Boeing will not allow that to happen. We'll go face to face with any regulator who tries to make that a requirement.'" (*Id.*, ¶84.) In a 2018 message apparently referring to interactions with the FAA, a Boeing employee stated: "I still haven't been forgiven by God for the covering up I did last year[.]"[8] (*Id.*, ¶83.)

---

[5] Alteration in original.

[6] Alteration in original.

[7] Alteration in original.

[8] Alteration in original.

ORDER – 4

Boeing reported a potential MCAS failure should be ranked as "major" (causes "physical distress to occupants of aircraft"), rather than hazardous (likely to result in "serious or fatal injury to small number" of occupants) or catastrophic (likely to result in "multiple fatalities and/or loss of" aircraft). (*Id.*, ¶¶46-49.) However, the safety analysis originally submitted in support of certification did not include the changes to MCAS's increased power, resetting function, and reliance on a single sensor. (*Id.*) In depicting MCAS as benign, unlikely to activate, and similar to an already known error, Boeing succeeded in avoiding a training requirement and removing it from the manual. (*Id.*, ¶¶51-54.) The FAA also agreed to waive requirements for cockpit alerts after Boeing argued their addition would be "'impractical" and cost too much. (*Id.*, ¶50.)

C.    Marketing of the MAX

Plaintiffs allege that, in marketing to purchasers, Boeing claimed the MAX would offer similar benefits to the A320neo, while ensuring 737NG-trained pilots would need little or no additional training, and that the MAX would maintain or exceed the 737NG's reputation for safety and reliability. (*Id.*, ¶¶55, 87.) For example, in 2014, Boeing's publication *Aero* touted the MAX as offering "'improved fuel efficiency and reduced noise while extending the 737's reputation for reliability and retaining commonalities with the current 737 fleet.'" (*Id.*, ¶88.) At the 2017 Paris Air Show, the Boeing MAX Chief Pilot asserted the MAX "'is configured to be very common with the NG . . . so a pilot can walk into [the cockpit][9] and will find everything he can just like he can in the NG'"; that the MAX was FAA-approved for two-and-a-half hours of computer-based training; and that "'[t]he only minor difference'"[10] from the NG was in the display, "to move some of the center console items here on the forward console.'" (*Id.*, ¶56.) He did not disclose the existence of MCAS. Nor did Boeing mention MCAS in either the flight crew operating manuals or the Detail Specifications provided to plaintiffs. (*Id.*, ¶¶57-59.) It also failed to disclose the inadvertent deactivation in most MAX aircraft of an "AOA disagree" warning light, despite discovering that defect during software development in 2017. (*Id.*, ¶¶60, 65.) Plaintiffs allege Boeing oversold the benefits of the MAX, while underplaying, denying, or failing to disclose material dangers, consistent with a "self-described practice of having its sales force 'lie [to purchasers] about how awesome our airplanes are.'"[11] (*Id.*, ¶62.)

D.    Crashes and Grounding

On October 28, 2018, Lion Air Flight 610 crashed some eleven minutes after takeoff, killing all 189 passengers and crew on board. (*Id.*, ¶63.) The single

---

[9] Alteration in original.

[10] Alteration in original.

[11] Alteration in original.

ORDER – 5

AOA sensor incorrectly "'told'" MCAS the aircraft was stalled and MCAS pushed the aircraft's nose down twenty-six times, eventually overcoming the pilots' efforts to avoid the crash. (*Id*.)

A Flight Crew Operations Manual Bulletin issued by Boeing on November 6, 2018 did not mention MCAS. (*Id*., ¶¶65-66.) Boeing also issued public statements suggesting pilot error caused the crash. (*Id*.) An Emergency Airworthiness Directive issued by the FAA on the following day advised of the "unsafe condition" posed by "an erroneously high single AOA sensor input" that could lead to difficulty controlling the airplane and possible impact with terrain, and ordered Boeing to modify its MAX manual to include specific warnings and instructions on procedures to respond to an erroneously triggered MCAS. (*Id*., ¶¶67-68 & n.54.) Two days later, Boeing disclosed the existence of MCAS in an email to purchasers, pilots, and others, and advised pilots "'can' use electric trim switches on the control column prior to hitting cutout switches to disable the MCAS program." (*Id*., ¶69.) Boeing also publicly claimed the "MAX is as safe as any airplane that has ever flown the skies." (*Id*., ¶90.) Boeing delivered [Boeing Business Jet (BBJ)] MAX aircraft to WTC/F&L on November 28, 2018 and to Brilliant on January 11, 2019. (*Id*., ¶70.)

On March 10, 2019, Ethiopian Air Flight 302 crashed some six minutes after takeoff, killing all 157 passengers and crew on board. (*Id*., ¶71.) The crash followed the persistent engagement of MCAS due to the failure of the single AOA sensor relied upon and forced the aircraft into an unrecoverable dive. (*Id*., ¶72.) It occurred despite the pilots' success in hitting the cutout switches described in Boeing's emergency directive. (*Id*.)

Within three days of the crash, aviation regulators worldwide grounded all MAX aircraft. (*Id*., ¶73.) On April 24, 2019, Boeing admitted MCAS activated in response to erroneous AOA information in both the Lion Air and Ethiopian Air crashes and that it was Boeing's responsibility to eliminate that risk. (*Id*., ¶74.) To date, the MAX remains grounded and investigations and other lawsuits are ongoing. (*Id*., ¶¶74-85.) Plaintiffs each revoked acceptance of their aircraft by written notice on January 29, 2020, but have been unable to return the aircraft because of the continued grounding. (*Id*., ¶96.)

Dkt. #57 at 2–8.

## III.      DISCUSSION

As Boeing's motion to dismiss is dispositive, the Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

ORDER – 6

1    **A. Plaintiffs' Fraud and Misrepresentation Claims**

2         The R&R, after noting the parties' general agreement that the similarities between fraud

3    and misrepresentation claims meant the claims could be addressed jointly, applied Federal Rule

4    of Civil Procedure 9(b)'s heightened pleading standard to both.  Dkt. #57 at 11–12.  Noting that

5    fraud and misrepresentation claims may rest upon two separate theories, the R&R considered the

6    claims under both a "misrepresentation of existing facts" theory and an "omission of existing

7    facts" theory.  *Id.* at 12 (citing *Zwicker v. Gen. Motors Corp.*, Case No. 2:07-cv-0291-JCC, 2007

8    WL 5309204 at *2, 4 (W.D. Wash. July 26, 2007)).   Judge Theiler dispatched with the

9    misrepresentation theory, noting that "[t]he complaint, in sum, does not plead with particularity

10   or identify misrepresentations on which plaintiffs could be said to have relied in deciding to

11   purchase MAX aircraft."  Dkt. #57 at 16.  No party has objected to this conclusion and the Court

12   accordingly adopts the reasoning and conclusion of the R&R and considers only Plaintiffs'

13   fraudulent omission theory.

14        As to Plaintiffs' fraudulent omission claims, the R&R concluded that Plaintiffs had

15   adequately alleged, in broad terms, that Boeing had notice of the MCAS issue and took active

16   steps to conceal relevant facts and that "[t]he omitted information—including, ultimately, the

17   risk that MCAS could cause a deadly airline crash—is self-evidently material."  *Id.* at 22.  Boeing

18   objects to this result on two bases.  First, Boeing objects that the R&R misapplied Washington's

19   duty to disclose material facts, expanding the duty beyond its bounds.  Dkt. #60 at 5.  Second,

20   Boeing objects that the R&R fails to hold Plaintiffs to their Rule 9(b) obligation to plead the

21   omission of material facts with particularity and impermissibly concluded that Boeing's

22   employees' knowledge could be imputed to the company as a whole.  *Id.*  The Court does not

23   agree on either point, adopting the reasoning and conclusion of the R&R.

24        The Court's de novo review reveals that the R&R was correct in concluding that Plaintiffs

adequately stated a claim for fraudulent omission premised on Boeing having a duty to disclose known defects.  Washington law provides that where a "manufacturer has superior information regarding defects that are not readily ascertainable to customers, it has a duty to disclose that information."  Dkt. #57 at 18 (quoting *Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1280 (W.D. Wash. 2020)) (quotation marks and citations omitted).  Plaintiffs' allege that these circumstances existed here.

Boeing's objection argues that the R&R focuses on Boeing's knowledge of the initial aerodynamic deficiencies resulting in "pitching" and thereby expanded a manufacturer's duty to disclose back to the development stage of products, requiring manufacturers to disclose every production hitch throughout a product's development. Dkt. #60 at 9; *id.* at 2 ("R&R misapplies . . . duty to disclose . . . and improperly creates a duty to disclose issues during product development").  Boeing maintains that while it identified the "pitching" issues early in the development of the 737 MAX, it subsequently developed and modified MCAS to remedy the defect, absolving itself of any duty to disclose the initial deficiencies.  *Id.* at 10.  Indeed, Boeing argues that "designing a complex product such as an airplane cannot involve a duty to disclose to purchasers every design issue addressed during the development process."  *Id.* (citation omitted).

But Boeing's argument relies on an unnecessarily narrow reading of the deficiencies alleged by Plaintiffs.  Plaintiffs do not limit their deficiency allegations to the aerodynamic deficiencies created by the addition and placement of larger engines, as Boeing represents.  Rather, and as the R&R notes, Plaintiffs additionally pointed to "the use of MCAS in lieu of making aerodynamic changes; the impact of MCAS, such as how it could cause the MAX to enter into a dive with a fault or malfunction in one of the aircraft's two AOA sensors; and the absence of any education or training on MCAS or emergency procedures for its malfunction."

1    Dkt. #57 at 16 (citing Dkt. #1-2 at ¶¶ 133–35, 152–55).  Boeing may wish to address only alleged

2    defects that it believes were "addressed during the development process," Dkt. #60 at 10, but

3    Plaintiffs specifically allege that Boeing's actions did not adequately remedy the identified

4    defects and did not provide for the safe operation of the 737 MAX.

5         Boeing also argues that Plaintiffs' fraudulent omission claims fail to satisfy Rule 9(b)'s

6    heightened pleading standard because Plaintiffs have not alleged sufficient facts to impute

7    "knowledge" of the defects to the company as a whole or prior to sale of the aircraft.  *Id.* at 11

8    (citing *Pope v. Univ. of Wash.*, 121 Wash.2d 479, 493, 852 P.2d 1055, 1063 (1993)).  The Court's

9    de novo review again confirms that the R&R correctly considered the issue on the record, Dkt.

10   #57 at 17–22, and Boeing's application of the relevant law is too stringent for the pleading phase.

11        For instance, the R&R notes that "the Rule 9(b) standard may be relaxed where

12   information is within a defendant's control and a plaintiff 'cannot be expected to have personal

13   knowledge of the relevant facts." Dkt. #57 at 10 (citing *Neubronner v. Milken*, 6 F.3d 666, 672

14   (9th Cir. 1993)); *see also* Dkt. #60 at 13–14 (conceding the same).  It is upon this legal base that

15   the R&R notes the numerous facts supporting an inference of Boeing's knowledge of the relevant

16   defects.  Plaintiffs alleged facts demonstrating that the cause of the relevant defects was known

17   as early as 2012, Boeing's obfuscation of the issues to avoid more intensive certification and

18   training issues, continuing discovery of the scope of the MCAS issues, and continuing

19   nondisclosure of the issues or even the MCAS system. Dkt. #57 at 19–20.  Taken as a whole,

20   Plaintiffs have alleged that the issues and defects were known in several portions of Boeing's

21   operations, including engineering, testing, FAA compliance, and sales.  This breadth, combined

22   with the importance of the 737 MAX's success and the directive to avoid rigorous FAA

23   certification and training requirements, lead to the reasonable inference, at this stage of the case,

24   that knowledge of the issues can be imputed to the company as a whole.  *Id.* at 21–22 (noting

ORDER – 9

that allegations of employee statements "merely buttress[] the inference of Boeing's knowledge").

## B. Plaintiffs' WCPA Claim

As to Plaintiffs' WCPA claim, the R&R ultimately determined that the claims were not viable as the transactions fell outside the scope of the WCPA. Specifically, the R&R notes that the transactions at issue do not have the capacity to deceive a substantial portion of the public, thereby affecting the public interest, because Boeing engages in only 9-10 sales of Boeing Business Jets per year and the parties to those transactions are sophisticated parties with equal bargaining power. Dkt. #57 at 24–28.

Plaintiffs object to the R&R's recommendation that the Court dismiss their WCPA claim. Dkt. #59 at 2. But Plaintiffs' scarce argument makes clear that the objection was primarily to preserve the issue for any possible appeal. *Id.* at 1 (objecting "in light of uncertainty under Ninth Circuit law as to whether a specific objection is required to preserve such an issue for an ultimate appeal"). Defendants respond that the objection is too "general" as to require the Court's de novo review and that, regardless, the R&R correctly recommended dismissal of Plaintiffs' WCPA claims. Dkt. #64 at 5–8. The Court agrees and, to the extent necessary, denies Plaintiffs' objection.

## C. Plaintiffs' WPLA Claim

The R&R recommends that the Court should permit Plaintiffs' WPLA claims to proceed. Dkt. #57 at 32. Boeing objects on the basis of many of the same arguments rejected by the R&R. Dkt. #60 at 14–16. While the Court agrees with much of the R&R's analysis, the Court ultimately reaches the opposite result and dismisses Plaintiffs' WPLA claim.

The WPLA provides a "cause of action for harm caused by products that are not designed, constructed, or labeled in a reasonably safe manner." Dkt. #57 at 28 (citing WASH. REV. CODE

ORDER – 10

§ 7.72.030).  "Harm," however, excludes "direct or consequential economic loss," leaving purely economic losses to contract law.  *Id.* (citing WASH. REV. CODE § 7.72.010(6); *Hofstee v. Dow*, 109 Wash. App. 537, 543, 36 P.3d 1073, 1076–77 (2001)).  But the determination of whether a harm is purely economic turns on a more holistic "risk of harm analysis" considering (1) whether the product's failure was "sudden and dangerous" or (2) a more general evaluation of the nature of the defect, the type of risk presented, and the manner in which the injury arose.  Dkt. #57 at 29–30 (citing *Wash. Water Power Co. v. Graybar Elec. Co.*, 112 Wash.2d 847, 857–60, 865–66, 774 P.2d 1199 (1989); *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wash.2d 334, 351–52, 831 P.2d 724 (1992); *Moodie v. Remington Arms Co., LLC*, Case No. 2:13-cv-0172-JCC, 2013 WL 12191352 at *6 (W.D. Wash. Aug. 2, 2013)).

      The R&R's treatment of the WPLA claim rejects Boeing's initial argument that Plaintiffs cannot state a WPLA claim because their aircraft have not experienced the MCAS-related malfunction during flight.  Dkt. #57 at 31 ("the fact that a hazardous product defect has injured only the product itself, and not persons or other property, is properly regarded as a 'pure fortuity[]'") (quoting *Graybar Elec. Co.*, 112 Wash.2d at 865–66).  The R&R then considered Plaintiffs' alleged harms under the evaluative approach:

> Plaintiffs allege the BBJ MAX aircraft were not reasonably safe as designed, include defects that could cause the aircraft to enter into an unrecoverable dive and crash, and that Boeing failed to inform them of the defects and the dangers posed.  The allegations set forth defects posing an unreasonable risk of harm to persons, property, and the products themselves, implicating the safety-insurance policies of tort law, and extending beyond products contracted for that simply did not work as planned.  Considered as such, the Court concludes plaintiffs state a WPLA claim sufficient to withstand a motion to dismiss.

Dkt. #57 at 32 (citations omitted).

      Boeing objects to the R&R on the basis that it "erroneously extend[ed] the WPLA to purchasers of a product who have never used the product or been exposed to any potential harm

1   from it." Dkt. #60 at 5.  Boeing objects that the R&R looks to the crashes suffered by other

2   Boeing customers to consider the risk of harm inherent in Plaintiffs' aircraft, effectively allowing

3   Plaintiffs to "bring a WPLA claim based on an accident involving another product belonging to

4   an unrelated customer."  *Id.* at 15.  Boeing argues that the Court's risk of harm analysis must

5   instead look to "a 'product failure [that] has occurred' involving *the plaintiff's own product* and

6   look[] to whether that product failure posed a risk of harm to the individual plaintiff."  *Id.*

7   (citations omitted) (emphasis in original).

8       The Court agrees that the proper inquiry focuses on the harm suffered by the plaintiff.

9   *See Plaza 600 Corp. v. W.R. Grace & Co.-Conn*, No. C89-1562D, 1991 WL 539568, at *3 (W.D.

10  Wash. June 19, 1991) ("nature of the plaintiff's alleged injury" is at the center of the court's

11  consideration).  This does not mean that the plaintiff must have suffered personal injury or even

12  damage to the product.  *See Pointe at Westport Harbor Homeowners' Ass'n v. Engineers Nw.,*

13  *Inc., P.S.*, 193 Wash. App. 695, 704, 376 P.3d 1158, 1163 (2016) ("We disagree that an

14  engineer's independent tort duty is limited to situations in which the engineers' failure to exercise

15  reasonable care results in personal injury or physical damage to property.").  But the plaintiff

16  must have been exposed to some risk of harm.

17      Plaintiffs' alleged harm flows from their central position that "had [they] known about

18  MCAS, the design changes of the MAX that required the use of MCAS, and the risk that these

19  modifications posed, Plaintiffs would not have purchased MAX aircraft from Boeing and would

20  not have accepted delivery." Dkt. #1-2 at ¶ 97.  Plaintiffs complain that they anticipated minimal

21  changes from the 737NG, the need for only limited training, and continuation of the 737NG's

22  favorable safety record.  *Id.*  Accordingly, Plaintiffs allege that they now own "an aviation asset

23  that has lost substantial value, if not all value" and "have thus incurred significant damages in

24  the form of diminution of value, as well as additional damages in the form of additional expense,

ORDER – 12

1   costs of temporary cover, and other items." *Id.* at ¶ 98.  Beyond these clearly economic harms,

2   Plaintiffs allege only that, even after repairs, their intended users—"employees, associates,

3   purchasers, business partners, spouses, and children"—"may refuse to fly on the Aircraft." *Id.*

4   at ¶ 99.[12]  Discounting their purely speculative claims, Plaintiffs do not allege a risk of harm.

5        This conclusion is wholly consistent with Washington law and the cases cited in the R&R.

6   First, Plaintiffs do not allege that they have flown the aircraft.  *Id.* at ¶ 93 (indicating that the

7   aircraft were accepted on November 29, 2018, and January 11, 2019, and that when the 737MAX

8   was grounded, on March 13, 2019, both "Aircraft were undergoing finishing work at completion

9   facilities," and that Plaintiffs have not been able to use the aircraft).  As a result, Plaintiffs have

10  failed to present allegations that they were exposed to the possible failure of the MCAS system

11  or an attendant risk of harm.  *C.f. Touchet Valley*, 119 Wash.2d at 351, 831 P.2d at 733 (faulty

12  construction of grain storage facility presented "real, nonspeculative danger of physical injury to

13  any persons walking in or about the" facility); *Zwicker*, 2007 WL 5309204 at *4 (W.D. Wash.

14  July 26, 2007) (plaintiff who operated vehicle with faulty speedometer, without incident, was

15  nevertheless exposed to significant risk of harm by possible failure).  Plaintiffs' complaint is,

16  instead, that Boeing's faulty MCAS system resulted in the grounding of the 737 MAX, thereby

17  interfering with Plaintiffs' ability to fly their aircraft—their contractual expectations.

18       Second, Plaintiffs do not allege that the MCAS defects render the aircraft inherently

19  dangerous.  *C.f. Moodie*, 2013 WL 12191352 at *7 (finding "unreasonable risk of harm"

20  presented by defective gun which could fire without a trigger pull); *Plaza 600 Corp.*, 1991 WL

21

22  [12] As specifically related to their WPLA claims, Plaintiffs further allege that their harms include
    "(a) payment of substantial sums to Boeing for the purchase of the Aircraft; (b) substantial sums
23  spent in connection with the completion of the Aircraft, (c) costs associated with the ownership
    and loss of use of the Aircraft during the time they cannot be used for its intended purpose;  (d)
24  loss in value; (e) justified fears and concerns and associated physical injuries; and (f) other costs
    and losses to be proven at trial."  Dkt. #1-2 at ¶ 199.

ORDER – 13

539568 at *3 (W.D. Wash. June 19, 1991) (fireproofing product containing asbestos, which was chipping and flaking above ceiling, did not result only in increased expense for work in the contaminated area but also presented a real hazard to humans who may access the contaminated area without adequate protection).  In fact, Plaintiffs do not allege that MCAS poses a risk of harm outside the aircraft's operation in flight.  *See Hofstee*, 109 Wash. App. at 543, 36 P.3d at 1076–77 (loss of use of cows during quarantine due to positive brucellosis test was economic loss, a "failure to meet the expectations under the contract," and not indicative of hazardous product requiring protection of tort law, especially because further testing revealed no brucellosis infection).  Plaintiffs' inability to operate their aircraft once again represents a failure to meet their contractual expectations, not a risk of harm from an inherently unsafe product.

In sum, the Court concludes that Plaintiffs' harms are contractual in nature.  They expected that their aircraft would "conform to the appropriate Type Certificate issued by the United States Federal Aviation Administration (FAA) for the Aircraft and will obtain from the FAA and furnish to Customer at Delivery of the Aircraft either a Standard Airworthiness Certificate or an Export Certificate of Airworthiness."  Dkt. #1-2 at ¶ 91.  Plaintiffs are barred, by the economic loss rule, from pursing their claims under the WPLA.[13]

**D. Plaintiffs' Notice of Supplemental Authority**

Lastly, the Court notes that Plaintiffs have filed a notice of supplemental authority and have attached a deferred prosecution agreement between Boeing and the United States and a waiver of indictment.  Dkt. #67.  Boeing opposes the filing as not in conformance with the Court's local rules because it presents factual materials as opposed to supplemental *authority*.  *See* Local

---

[13] The Court notes briefly that Plaintiffs do little to support the R&R's treatment of their WPLA claim in their response to Boeings objections.  Plaintiffs devote less than one page of their 12-page response to their WPLA claims and, even then, their arguments amount to merely asserting that the R&R was correct and already rejected Boeing's arguments.

ORDER – 14

Rules W.D. Wash. LCR 7(n) (prior to ruling on a motion, parties "may bring to the court's attention relevant authority issued after the date the party's last brief was filed").  The Court agrees and does not consider the facts set forth in the deferred prosecution agreement.

## IV.   CONCLUSION

Accordingly, and having reviewed the R&R, the parties' objections, and related briefing and having conducted de novo review of the portions of the R&R to which objections were made, the Court finds and ORDERS:

1.  The Report and Recommendation (Dkt. #57) is adopted to the extent it is consistent with this Order.

2.  The parties' objections (Dkts. ##59–60) are sustained and overruled as specified in this Order.

3.  Defendants' Motion to Dismiss (Dkt. # 41) is GRANTED in part and DENIED in part. Plaintiffs' WPLA claims and WCPA claims are DISMISSED.

4.  The Clerk is directed to send copies of this Order to the parties and to the Honorable Mary Alice Theiler.

Dated this 26th day of February, 2021.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 15